**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOSEPHINE BROOKER,            )
                                    )
      Plaintiff,            )
                                      )    CIVIL ACTION NO. 3:11-CV-95
    v.                          )    JUDGE KIM R. GIBSON
                                    )
ALTOONA HOUSING AUTHORITY,    )
CHERYL JOHNS, *its Executive Director*,  )
LINDA WALTER, *Section 8 Coordinator*,  )
and JOHN or JANE DOE,           )
                                    )
      Defendants.        )

## MEMORANDUM OPINION AND ORDER OF COURT

**GIBSON, J.**

### I. SYNOPSIS

This matter comes before the Court on cross-motions for summary judgment filed by the parties pursuant to Federal Rule of Civil Procedure 56. ECF Nos. 44 & 50. For the following reasons, the Plaintiff's motion for summary judgment (*ECF No. 44*) will be denied, and the Defendants' motion for summary judgment (*ECF No. 50*) will be granted in part and denied in part. The trial presently scheduled to begin on July 22, 2013, will be conducted within the parameters established in this opinion. ECF No. 92.

### II. BACKGROUND

Plaintiff Josephine Brooker ("Brooker") was born on May 7, 1946. ECF No. 47-15 at 2. On August 5, 2004, she protectively applied for disability insurance benefits and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act [42 U.S.C. §§ 401-433, 1381-1383f]. ECF No. 53-1 at 5. In a decision rendered on May 22, 2006, Administrative Law Judge Raymond J. Zadzilko determined that Brooker was "disabled" and

1

entitled to benefits. *Id.* at 5-11. Brooker was awarded monthly payments of $525.00 under Title II and $169.00 under Title XVI, for a total of $694.00 per month. ECF No. 53-4 at 2-3.

The United States Housing Act of 1973 ("Housing Act") [42 U.S.C. § 1401 *et seq.*] provides housing for qualifying families through the funding of residential units owned and operated by "public housing agencies." 42 U.S.C. § 1437a. "Dwelling units assisted under [the Housing Act are] rented only to families who are low-income families at the time of their initial occupancy of such units." 42 U.S.C. § 1437a(a)(1). A participating family ordinarily contributes thirty percent of its "monthly adjusted income" to the payment of rent. 42 U.S.C. § 1437a(a)(1)(A). The Department of Housing and Urban Development ("Department") covers the additional costs of public housing through payments made to public housing agencies. 42 U.S.C. § 1437c.

The Housing and Community Development Act of 1974 amended the Housing Act "[f]or the purpose of aiding lower-income families in obtaining a decent place to live." Pub. L. No. 93-383, § 201(a); 88 Stat. 633, 662 (1974); 42 U.S.C. § 1437f(a). This statutory amendment created "the Section 8 housing program," which subsidizes private landlords who rent dwellings to low-income tenants. *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 12, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993). A participating family typically makes rental payments in the amount of thirty percent of its "monthly adjusted income." 42 U.S.C. § 1437f(o)(2)(A)(i). Public housing agencies cover the remaining costs of housing eligible individuals by making payments to landlords pursuant to "housing assistance payment contracts." 42 U.S.C. § 1437f(o)(10).

Pennsylvania's Housing Authorities Law [35 PA. STAT. § 1541 *et seq.*] creates "housing authorities" for each city and county existing within the Commonwealth. 35 PA. STAT. § 1544(a). A housing authority does not "become operative" until the "governing body" of the

2

relevant city or county "find[s] and declare[s] by proper resolution that there is a need for an Authority to function within the territorial limits of said city or county." 35 PA. STAT. § 1544(a)-(b). On October 24, 1949, the City of Altoona enacted an ordinance recognizing the need for a housing authority to operate within its territorial limits. ECF No. 53-6 at 2-4. This action caused the Altoona Housing Authority ("Authority") to "become operative." 35 PA. STAT. § 1544(a). Defendant Cheryl Johns ("Johns") serves as the Authority's Executive Director. ECF Nos. 46 & 52 at ¶ 7. Defendant Linda Walter ("Walter") serves as the Coordinator for the Section 8 program administered by the Authority. *Id.* at ¶ 9.

Brooker applied for housing assistance on April 7, 2009. ECF No. 53-12 at 2-3. In a written application submitted to the Authority, Brooker requested that she be permitted to reside in the "Eleventh Street Tower." *Id.* at 2. That facility was a public housing development owned and operated by the Authority. ECF Nos. 46 & 52 at ¶ 13. It was specifically designated for disabled and elderly tenants. *Id.* Brooker's application was approved in July 2009. *Id.* Shortly thereafter, she became a resident of the Eleventh Street Tower. *Id.* Brooker's monthly rental contribution was set at $207.00. *Id.* at ¶ 14. On May 12, 2010, Brooker applied for rental assistance through the Section 8 program. ECF No. 53-17 at 2. She took this action in an attempt to move out of the Eleventh Street Tower and into a privately-owned dwelling. ECF No. 53-10 at 8-9.

Brooker experienced a psychotic episode on the morning of May 20, 2010. ECF Nos. 46 & 52 at ¶ 22. Acting on the basis of delusions, she turned on her faucets, boiled pots of water, and obstructed the entrance to her apartment. *Id.* The situation was discovered by a maintenance employee, who smelled gasoline and unsuccessfully attempted to enter the dwelling. *Id.* at ¶ 23. Police officers and emergency medical personnel were contacted. *Id.* The emergency

3

responders forcibly entered Brooker's apartment. *Id.* at ¶ 24. They were accompanied by Linda Holsinger ("Holsinger"), who worked for the Authority as an Interim Administrative Officer. *Id.* at ¶¶ 24-25; ECF No. 47-3 at 9. The individuals entering the apartment found Brooker to be "disoriented, upset and nude under her open housecoat." ECF No. 46 at ¶ 24. She was transported to the Behavioral Health Unit of the Altoona Regional Health System ("Altoona Regional") for a psychiatric evaluation. *Id.*

After leaving Brooker's apartment, Holsinger returned to her office, telephoned Johns, and recommended that an "eviction notice" be placed on Brooker's door. ECF Nos. 46 & 52 at ¶ 29. Later that day, a letter to Brooker from Stephanie Price ("Price"), a Project Manager for the Authority, was placed on the door to Brooker's apartment. ECF No. 53-22 at 2-3. The letter, which was dated May 20, 2010, was prefaced with language reading, "**NOTICE TO QUIT/EVICTION**." *Id.* at 2 (boldface type, underlining and capitalization in original). The following "reason" was given for Brooker's removal:

> Incident on May 20, 2010 at approximately 10:00 A.M. a [*sic*] smell of gas was resonating from your unit. You refused to admit entry into your unit by AHA staff and had your door barricaded and windows all sealed with tape. The Altoona Fire Department, Altoona Police Department, and Amed had to be called in order to enter your apartment and shut off the gas.

*Id.* (boldface type and italics omitted). Brooker was instructed to vacate the premises within thirty days. *Id.* at 2. At the conclusion of the letter, Price informed Brooker of her right to request an "informal conference" under 24 C.F.R. § 966.55 in the event that she disagreed with the Authority's decision. *Id.* at 3. Brooker was given fourteen days from the date of her receipt of the letter to request such a hearing. *Id.* The letter further stated that Brooker's failure to request an "informal conference" "w[ould] not constitute a waiver of [her] right to contest the Authority's action at the appropriate judicial level." *Id.*

4

Inpatient treatment for mental illness is governed by Pennsylvania's Mental Health Procedures Act ("MHPA") [50 PA. STAT. § 7101 *et seq.*]. 50 PA. STAT. § 7103. Any person who has reached the age of fourteen may voluntarily admit himself or herself for inpatient treatment, provided that he or she "understands the nature of voluntary treatment." 50 PA. STAT. § 7201. A voluntary patient may withdraw from treatment without notice unless, at the time of his or her admission, he or she has agreed to provide advance notice of such a withdrawal before leaving the relevant facility. 50 PA. STAT. § 7206(a). Although the notice period may be agreed to at the time of an individual's admission, it cannot exceed seventy-two hours. *Id.* The MHPA also provides for the involuntary hospitalization of an individual who is "severely mentally disabled and in need of immediate treatment." 50 PA. STAT. § 7301(a). When the applicable statutory criteria are satisfied, a physician may authorize involuntary treatment for a period not to exceed 120 hours. 50 PA. STAT. § 7302. Additional periods of involuntary treatment may be authorized by a judge or a mental health review officer after hearings conducted in accordance with the MHPA's provisions. 50 PA. STAT. §§ 7303-7305.

When Brooker arrived at Altoona Regional, she voluntarily admitted herself for inpatient psychiatric treatment pursuant to 50 PA. STAT. § 7201. ECF No. 53-36 at 2. The documentary record indicates that, at some point during the course of her hospitalization, Brooker provided written notice of her intent to withdraw from treatment within seventy-two hours. *Id.* Shortly thereafter, she was apparently "made subject to court-ordered involuntary treatment" in accordance with 50 PA. STAT. § 7304.[1] *Id.* Brooker was discharged from inpatient care on June

---

[1] The circumstances surrounding Brooker's commitment are not entirely clear. A discharge summary prepared by a nurse states that Brooker was "[a]dmitted on a 201 commitment" and "[d]ischarged on a 304 commitment." ECF No. 53-36 at 2 (underlining in original). The discharge summary further states that Brooker signed a "72 hr notice" at some point. *Id.* Unlike a five-day commitment under 50 PA. STAT. § 7302, which may be authorized by a physician, a longer commitment implemented pursuant to 50 PA. STAT. § 7304 can only be authorized by a judge or a mental health review officer. 50 PA. STAT. §§ 7302, 7304. Since Brooker was converted from "201" to "304"

2, 2010, and advised to seek follow-up treatment on an outpatient basis. *Id.* At the time of her discharge, Brooker was mentally and physically "stable." *Id.*

On June 3, 2010, Brooker provided the Authority with written notice of her intent to vacate her apartment in the Eleventh Street Tower. ECF No. 53-24 at 2. She surrendered her keys to the apartment on June 18, 2010. *Id.* Brooker temporarily moved into the residence of her daughter, Deborah Sills ("Sills"), and awaited a decision concerning her application for Section 8 rental assistance. ECF Nos. 46 & 52 at ¶ 36.

In a letter dated July 22, 2010, Walter informed Brooker that she was "nearing the top" of the Authority's "waiting list" for a one-bedroom unit. ECF No. 53-17 at 3. Walter's letter further advised that additional information was needed to process the Section 8 application that Brooker had filed on May 12, 2010. *Id.* This communication apparently prompted Brooker to file a new application for Section 8 rental assistance on August 4, 2010. *Id.*; ECF No. 53-18 at 2.

A regulation governing the provision of Section 8 benefits permits a public housing agency to deny a family's application for rental assistance "[i]f any member of the family has been evicted from federally assisted housing in the last five years." 24 C.F.R. § 982.552(c)(2). On September 3, 2010, Walter sent Brooker a letter stating that the Authority was withdrawing her application for Section 8 rental assistance from its waiting list because she had been "[e]victed from the Eleventh Street Tower."[2] ECF No. 53-25 at 2. Enclosed with the letter was a form that Brooker could complete if she wished to "appeal the Authority's decision." *Id.* Brooker completed the form and requested that an "[i]nformal [h]earing" be conducted to

---

status during the course of her hospitalization, a judge or a mental health review officer must have entered an order directing that she be treated on an involuntary basis. 50 PA. STAT. §§ 7109, 7304.

[2] Walter's letter stated that Brooker had applied for Section 8 rental assistance on April 8, 2009. ECF No. 53-25 at 2. The Authority apparently received Brooker's earlier application for residency at the Eleventh Street Tower on that date. ECF No. 53-12 at 2. It appears that Walter confused the applicable application dates when she informed Brooker of the denial of her Section 8 applications. ECF No. 53-25 at 2.

facilitate review of the Authority's decision removing her name from its waiting list.[3] ECF No. 53-26 at 2-3. On the portion of the form soliciting her reasons for contesting the Authority's decision, Brooker stated that she had stopped taking her "depression medication" because it had elevated her blood pressure. *Id.* at 2. She attributed her psychotic episode of May 20, 2010, to the discontinuance of her medication. *Id.* Brooker also asserted that her conduct on that date could have been triggered by a urinary tract infection. *Id.* at 3. In support of her position, Brooker submitted a letter from Certified Registered Nurse Practitioner ("CRNP") Stephanie Scheeler ("Scheeler"). In her letter, Scheeler stated as follows:

> Josephine Brooker currently receives treatment at the Primary Health Network Altoona Behavioral Health Center. She is prompt for appointments and compliant with her treatment regimen. At the time of her hospitalization and her incident at the towers she had been having medical and psychiatric problems that have since cleared. Please consider this in her quest for re-obtaining her apartment.

ECF No. 53-27 at 2. Relying on Scheeler's comments, Brooker insisted that she was "doing better" and suggested that she would not experience psychotic episodes in the future. ECF No. 53-26 at 2-3.

The hearing requested by Brooker was held before Informal Hearing Officer Jeffrey A. Muriceak ("Muriceak") on November 10, 2010. ECF No. 47-25 at 1, 3. Brooker, who was represented by counsel, appeared and testified at the hearing. *Id.* at 1-2. She stated that she had stopped taking Cymbalta two weeks prior to May 20, 2010, and that her conduct on that date had resulted from her discontinuance of that medication. *Id.* at 3. Walter appeared and testified on behalf of the Authority. *Id.* at 1. Documentary evidence was submitted in support of the Authority's position. *Id.* at 2.

---

[3] Brooker was given fifteen days to appeal the Authority's decision. ECF No. 53-25 at 2; ECF No. 53-26 at 2. Although Walter's letter was dated September 3, 2010, the form was dated September 13, 2010. *Id.* Brooker completed the form and requested that an "informal hearing" be held to consider her application for rental assistance. ECF No. 53-26 at 2-3. The Authority received Brooker's hearing request on September 27, 2010. *Id.* at 2.

Muriceak affirmed the Authority's decision on November 10, 2010. *Id.* at 4. In his decision, Muriceak determined that Brooker's "evict[ion] from public housing" had been "demonstrated by a preponderance of the evidence." *Id.* It was specifically noted that Brooker had been afforded an opportunity to challenge the termination of her lease at the Eleventh Street Tower, and that she had declined to do so. *Id.* at 3. Muriceak further observed that the Authority had imposed only a three-year ban on Brooker's potential receipt of Section 8 rental assistance even though the applicable regulation permitted such a ban to remain effective for five years. *Id.* at 4.

On December 10, 2010, Brooker appealed Muriceak's decision to the Court of Common Pleas of Blair County pursuant to 2 PA. CONS. STAT. § 752. ECF No. 53-40 at 2-7. The Court of Common Pleas directed Brooker to compile documents relating to her mental health treatment and submit them to the Authority. ECF No. 53-32 at 2. Brooker filed a praecipe to discontinue her appeal on April 11, 2011. ECF No. 53-33 at 2. In a letter to President Judge Jolene Grubb Kopriva dated April 12, 2011, Attorney Rebecca L. Ardoline stated that Brooker was withdrawing her appeal in order to "pursue legal redress in the U.S. District Court for the Western District of Pennsylvania." ECF No. 53-34 at 2.

Brooker commenced this action against the Authority, Johns and Walter on April 13, 2011, alleging violations of the Housing Act, the Fair Housing Act of 1968 ("FHA") [42 U.S.C. § 3601 *et seq.*], the Rehabilitation Act of 1973 [29 U.S.C. § 701 *et seq.*], the Americans with Disabilities Act of 1990 ("ADA") [42 U.S.C. § 12101 *et seq.*], and the Fourteenth Amendment to the United States Constitution. ECF No. 1. In her verified complaint, Brooker sought various forms of equitable and monetary relief, including an award of punitive damages. *Id.* at 14-15. On May 16, 2011, the Defendants moved for the dismissal of Brooker's claims under the

Housing Act and the Fourteenth Amendment, Brooker's claims against Johns and Walter, and Brooker's request for an award of punitive damages. ECF No. 4. In a memorandum opinion and order dated March 16, 2012, the Court dismissed the FHA, Rehabilitation Act and ADA claims asserted against Johns and Walter in their individual capacities. *Brooker v. Altoona Housing Authority*, Civil Action No. 11-95, 2012 WL 913242, at *6, 2012 U.S. Dist. LEXIS 35691, at *17 (W.D.Pa. March 16, 2012). The motion to dismiss was denied in all other respects. *Id.*

Brooker moved for summary judgment on August 27, 2012. ECF No. 44. The Defendants responded on September 24, 2012, by filing their own motion for summary judgment. ECF No. 50. The parties advanced their respective positions during an oral argument session conducted on January 11, 2013. ECF No. 79. The cross-motions for summary judgment filed by the parties are the subject of this memorandum opinion.

## III. STANDARD OF REVIEW

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted. FED. R. CIV. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the Court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Township*, 478 F.3d 144, 147 (3d Cir. 2007).

9

The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact.[4] *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex Corp.*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## IV. JURISDICTION AND VENUE

The Court has jurisdiction to entertain Brooker's claims pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(b).

## V. DISCUSSION

Brooker contends that the Authority violated her rights under the FHA, the Rehabilitation Act and the ADA by terminating her residency at the Eleventh Street Tower and denying her application for Section 8 rental assistance because of her disability. ECF No. 1 at ¶¶ 73-75. She claims that she was never "evicted" from the Eleventh Street Tower, and that the Defendants

---

[4] Rule 56 was revised in 2010. The standard previously set forth in subsection (c) is now codified as subsection (a). The language of this subsection is unchanged, except for "one word—genuine 'issue' bec[ame] genuine 'dispute.'" Fed. R. Civ. P. 56 advisory committee's note, 2010 amend.

violated the Housing Act by denying her application for Section 8 rental assistance on that basis.
*Id.* at ¶ 71. Brooker also maintains that the Defendants violated her rights under the Due Process
Clause of the Fourteenth Amendment when they took these actions without providing notice of
her statutory right to request reasonable accommodations designed to alleviate the effects of her
medical condition. *Id.* at ¶ 72. The parties move for summary judgment with respect to each of
Brooker's claims. ECF Nos. 44 & 50. The Defendants argue that the Authority is immune from
any award of punitive damages sought by Brooker in this action, even if her claims are permitted
to proceed in all other respects. ECF No. 68 at 1-2. These issues will be addressed in sequential
order.

## A.     The Discrimination Claims

As originally enacted in 1968, the FHA prohibited discrimination against an individual in
the sale or rental of housing because of his or her race, color, religion or national origin. Pub. L.
No. 90-284, § 804; 82 Stat. 73, 83 (1968). Congress amended the FHA in 1974 to proscribe
similar forms of discrimination based on an individual's sex. Pub. L. No. 93-383, § 808; 88 Stat.
633, 729 (1974). The Fair Housing Amendments Act of 1988 ("FHAA") amended the FHA to
add subsection (f) to 42 U.S.C. § 3604. Pub. L. No. 100-430, § 6; 102 Stat. 1619, 1620-1621
(1988). The provisions of that subsection relevant to this case provide as follows:

> **§ 3604. Discrimination in the sale or rental of housing and other prohibited practices.**
> As made applicable by section 803 [42 U.S.C. § 3603] and except as exempted by
> sections 803(b) and 807 [42 U.S.C. §§ 3603(b), 3607], it shall be unlawful—
>
> \*\*\*
>
> (f)(1) To discriminate in the sale or rental, or to otherwise make unavailable or
> deny, a dwelling to any buyer or renter because of a handicap of—
>> (A) that buyer or renter[;]
>> (B) a person residing in or intending to reside in that dwelling after it is
>> sold, rented, or made available; or
>> (C) any person associated with that person.

(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—

    (A) that person; or

    (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

    (C) any person associated with that person.

(3) For purposes of this subsection, discrimination includes—

\*\*\*

    (B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling . . . .

\*\*\*

(9) Nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others.

42 U.S.C. § 3604(f).[5]   These provisions are applicable to housing units provided by the Authority. 42 U.S.C. § 3603(a). An aggrieved individual may commence a civil action to vindicate his or her rights under the FHAA. 42 U.S.C. § 3613(a).

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The Authority's operations qualify as a "program or activity" governed by the Rehabilitation Act. 29 U.S.C. § 794(b)(1). Section 504 has been construed to require recipients of federal financial assistance to reasonably accommodate the needs of disabled individuals. *Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1101 (3d Cir. 1996) (discussing the similarities between the

---

[5] The term "dwelling" is defined as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." 42 U.S.C. § 3602(b).

12

requirements of the FHAA and the requirements of the Rehabilitation Act). The Rehabilitation Act makes the "remedies, procedures and rights" set forth in Title VI of the Civil Rights Act of 1964 [42 U.S.C. § 2000d *et seq.*] available to individuals aggrieved by violations of § 504. 29 U.S.C. § 794a(a)(2). The Supreme Court has found an implied private right of action within Title VI. *Barnes v. Gorman*, 536 U.S. 181, 185, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002). Since Title VI's remedial scheme is incorporated within the Rehabilitation Act, plaintiffs alleging violations of § 504 have a private right of action under federal law. *Chedwick v. UPMC*, 619 F.Supp.2d 172, 181, n.4 (W.D.Pa. 2007).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The term "public entity" is defined broadly enough to include a public housing agency. 42 U.S.C. § 12131(1)(A)-(B); *Sinisgallo v. Town of Islip Housing Authority*, 865 F.Supp.2d 307, 337 (E.D.N.Y. 2012). Title II defines the term "qualified individual with a disability" as

an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). Violations of Title II may be redressed in the same manner as violations of § 504. See 42 U.S.C. § 12133. An individual aggrieved by a violation of Title II may commence a civil action against the public entity responsible for that violation. *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011). Public housing agencies operating under the

13

Housing Act are required to certify their compliance with the FHAA, the Rehabilitation Act and

the ADA on an annual basis. 42 U.S.C. § 1437c-1(d)(16).

The Secretary of Housing and Urban Development has promulgated regulations designed

to implement the Department's obligations under § 504 of the Rehabilitation Act. 24 C.F.R. §§

9.101-9.170. Among those regulations is 24 C.F.R. § 9.131, which provides:

### § 9.131  Direct threat.

(a) This part does not require the agency to permit an individual to participate in, or benefit from the goods, services, facilities, privileges, advantages and accommodations of that agency when that individual poses a direct threat to the health or safety of others.

(b) "Direct threat" means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services.

(c) In determining whether an individual poses a direct threat to the health or safety of others, the agency must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

24 C.F.R. § 9.131. This regulation mirrors the standard applicable under the FHAA. See 42

U.S.C. § 3604(f)(9).

The authority to promulgate regulations implementing Title II of the ADA has been

delegated to the Attorney General. 42 U.S.C. § 12134(a). A regulation promulgated pursuant to

that authority defines the term "direct threat" to mean "a significant risk to the health or safety of

others that cannot be eliminated by a modification of policies, practices or procedures, or by the

provision of auxiliary services as provided in § 35.139."[6] 28 C.F.R. § 35.104. That definition

makes specific reference to 28 C.F.R. § 35.139, which provides:

---

[6] The definition adopted by the Attorney General is virtually identical to the statutory definition of the term "direct threat" appearing in Title III of the ADA. 42 U.S.C. § 12182(b)(3). Title I of the ADA defines the term "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3).

14

**§ 35.139  Direct threat.**
　　(a) This part does not require a public entity to permit an individual to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others.
　　(b) In determining whether an individual poses a direct threat to the health or safety of others, a public entity must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

28 C.F.R. § 35.139.  The standard established by this regulation is not materially different from the standard established by § 9.131.  Compare 28 C.F.R. § 35.139 with 24 C.F.R. § 9.131. Although the Attorney General's regulations permit a public entity to enforce "legitimate safety requirements necessary for the safe operation of its services," the entity "must ensure that its safety requirements are based on actual risks" rather than "on mere speculation, stereotypes, or generalizations about individuals with disabilities."  28 C.F.R. § 35.130(h).

　　　The Defendants argue that Brooker was evicted from the Eleventh Street Tower because she "posed a significant risk to her neighbors and the Authority's property."  ECF No. 51 at 21. Brooker contends that the Defendants wrongfully forced her out of her home without considering the extent to which reasonable accommodations could have eliminated or mitigated any threat that she posed to others.  ECF No. 45 at 21-23.  She asserts that the Defendants decided to displace her without conducting the "individualized assessment" required under the applicable regulations.  24 C.F.R. § 9.131(c); 28 C.F.R. § 35.139(b).  The crux of Brooker's position is that such an assessment would have confirmed her ability to remain in the Eleventh Street Tower without endangering the welfare of her neighbors.  ECF No. 45 at 21-23.

　　　Brooker's discrimination claims arise under the FHAA, the Rehabilitation Act and the ADA.  ECF No. 1 at ¶¶ 73-75.  "All three statutory schemes embrace the concept that, in certain

instances, the policies and practices of covered entities must be modified to accommodate the needs of the disabled." *Wisconsin Community Services, Inc. v. City of Milwaukee*, 465 F.3d 737, 746 (7th Cir. 2006). The framework utilized to evaluate claims arising under the FHAA can typically be employed to adjudicate parallel claims arising under the Rehabilitation Act and the ADA. *Dr. Gertrude A. Barber Center, Inc. v. Peters Township*, 273 F.Supp.2d 643, 652 (W.D.Pa. 2003). A handicapped plaintiff proceeding under the FHAA can rely on a "disparate treatment," "disparate impact" or "reasonable accommodation" theory. *Community Services, Inc. v. Wind Gap Municipal Authority*, 421 F.3d 170, 176 (3d Cir. 2005). Brooker's discrimination claims are clearly based on an assertion that the Authority failed to "reasonably accommodate" her disability. ECF No. 1 at ¶¶ 73-75.

An individual with a "physical or mental impairment" that "substantially limits" one or more of his or her "major life activities" is considered to be "handicapped" and "disabled" for purposes of the FHAA, the Rehabilitation Act and the ADA. 29 U.S.C. § 705(20)(B); 42 U.S.C. §§ 3602(h)(1), 12102(1)(A)(1). During the relevant period of time, Brooker received benefits under the Social Security Act. ECF No. 53-4 at 2-3. Individuals who qualify for such benefits ordinarily fall within the class of persons entitled to statutory protection under the FHAA, the Rehabilitation Act and the ADA. *Sinisgallo*, 865 F.Supp.2d at 338. Holsinger and Walter both testified that the Authority considered any recipient of Social Security disability benefits to be "disabled."[7] ECF No. 47-3 at 41-42; ECF No. 47-4 at 34. Consequently, Brooker falls within the category of persons entitled to statutory protection under the applicable anti-discrimination

---

[7] Residency in the Eleventh Street Tower was apparently limited to "disabled" and "elderly" individuals. ECF No. 47-3 at 40-41. "[A]n individual can sometimes establish that he or she is 'handicapped' within the meaning of the FHA[A] simply by demonstrating that he or she resides in a facility that only admits 'handicapped' individuals." *McKivitz v. Township of Stowe*, 769 F.Supp.2d 803, 822 (W.D.Pa. 2010).

16

provisions.[8]  *Bragdon v. Abbott*, 524 U.S. 624, 630-632, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

In order to proceed with her "failure-to-accommodate" claims, Brooker must demonstrate that the Authority "knew or reasonably should have known" of her disability and concomitant need for reasonable accommodations. *Bentley v. Peace & Quiet Realty 2 LLC*, 367 F.Supp.2d 341, 345 (E.D.N.Y. 2005). The burden was on her to inform the Authority that she was a "qualified handicapped person" who was "being denied an equal opportunity to use and enjoy a dwelling."[9]  *Andover Housing Authority v. Shkolnik*, 820 N.E.2d 815, 826 (Mass. 2005). A public housing agency cannot be expected to accommodate a disability that is not known to exist. *Id.*

Brooker applied for Section 8 rental assistance on May 12, 2010. ECF No. 53-17 at 2. She testified that her place in the Eleventh Street Tower had been "cramped," and that she had started to look for "another place to live." ECF No. 47-1 at 40-42. After Brooker's May 20,

---

[8] The ADA Amendments Act of 2008 broadened the category of individuals entitled to statutory protection under the ADA and the Rehabilitation Act by altering the definition of the term "disability." Pub. L. No. 110-325, §§ 4-8; 122 Stat. 3553, 3555-3559 (2008). Prior to the enactment of the ADA Amendments Act, courts generally considered individuals who were "disabled" under the ADA and the Rehabilitation Act to be "handicapped" under the FHAA. *Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 45-48 (2d Cir. 2002). The ADA Amendments Act, however, did not amend the FHAA. Therefore, some individuals may not be "handicapped" within the meaning of the FHAA even though they are "disabled" within the meaning of the ADA and the Rehabilitation Act. *Bhogaita v. Altamonte Heights Condominium*, Civil Action No. 11-1637, 2012 WL 6562766, at *5, 2012 U.S. Dist. LEXIS 178183, at *13-15 (M.D.Fla. Dec. 17, 2012); *McKivitz v. Township of Stowe*, 769 F.Supp.2d 803, 821, n.15 (W.D.Pa. 2010). The Court need not confront that issue in this case. Since Brooker was able to secure benefits under the Social Security Act, she was clearly "handicapped" for purposes of the FHAA. *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 801-807, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (discussing the differences between the Social Security Act and the ADA); *Sinisgallo v. Town of Islip Housing Authority*, 865 F.Supp.2d 307, 338 (E.D.N.Y. 2012) (remarking that, "in most cases, individuals who meet the definition of disability for purposes of receiving SSI or SSDI benefits also qualify as disabled under the federal disability statutes").

[9] The United States Court of Appeals for the Third Circuit has held that land-use boards are not required to engage in an "informal interactive process" with those applying for variances. *Lapid-Laurel, L.L.C. v. Zoning Board of Adjustment*, 284 F.3d 442, 454-456 (3d Cir. 2002). It is not clear whether a public housing agency has a duty to engage in an "interactive process" with a handicapped tenant seeking accommodations. In contrast to a land-use board, which acts as a "market regulator," a public housing agency essentially acts as a "market participant" when it rents homes to eligible individuals. *McKivitz v. Township of Stowe*, 769 F.Supp.2d 803, 826 (W.D.Pa. 2010) ("An individual landlord is merely a market *participant* seeking to apply 'rules' and 'policies' to his or her own property, whereas a zoning authority is a market *regulator* entrusted with the duty to implement 'rules' and 'policies' applicable to an entire community.") (emphasis in original).

2010, psychotic episode, Holsinger telephoned Johns and sought permission to evict Brooker.

ECF No. 47-3 at 81. Johns testified that she had approved Holsinger's request. ECF No. 47-2 at

53-55. Acting pursuant to instructions given to her by Holsinger, Price placed an eviction notice

on Brooker's door. ECF No. 62-5 at 2, ¶ 8. The telephone call to the emergency responders was

placed by Sherry Symons ("Symons"), who worked as a case manager for Blair Senior Services,

Inc. ECF No. 47-7 at 24. Symons emailed her immediate supervisor, Melissa Raley ("Raley"),

shortly after the incident. *Id.* at 23. In her message to Raley, Symons stated as follows:

> An eviction is being prepared against Josephine Brooker because her actions
> endangered everyone in the building. However, Stephanie said that if her actions
> were a manifestation of a medical problem, like a UTI or something, they will
> most likely rescind the eviction.

ECF No. 53-21 at 2. Price was the "Stephanie" referenced in Symons' message. ECF No. 47-7

at 29.

Price described her involvement with the incident in a sworn affidavit. ECF No. 62-5. In

the final four paragraphs of her affidavit, Price stated as follows:

> 7.  Regarding the incident with Ms. Brooker on May 20, 2010, I was present
>     at the property, but I did not go into Ms. Brooker's apartment. I saw her
>     as she was transported on a gurney by medics to the hospital.
>
> 8.  Shortly after Ms. Brooker was taken to the hospital, I had a brief
>     conversation with Linda Holsinger, who directed me to post an eviction
>     notice she had drafted on Ms. Brooker's door, which I did.
>
> 9.  Later that day and in the day or two following the incident, Deborah Sills
>     spoke with me a few times about trying to get things straightened out for
>     Ms. Brooker. Ms. Sills told me that Ms. Brooker had been off her
>     medications and that she would be hospitalized for a while, and Ms. Sills
>     asked if there was anything that she and her husband or Ms. Brooker could
>     do to enable Ms. Brooker to come back to the Towers after she was
>     released from the hospital.
>
> 10. I informed Linda Holsinger of my conversations with Deborah Sills. I
>     asked Linda Holsinger if AHA could rescind the lease termination letter
>     and not pursue eviction if Josephine Brooker's actions on May 20, 2010

> were medically related. Linda Holsinger responded that AHA would not
> reconsider the termination and that Ms. Brooker could choose to fight it if
> she wished in court before the Magistrate.

*Id.* at 2, ¶¶ 7-10. Holsinger testified that she had spoken with Sills shortly after the incident, and

that Sills had stated that the psychotic episode had been triggered by Brooker's failure to take her

medications as prescribed. ECF No. 47-3 at 88.

Sills and Brooker apparently met with Price shortly after Brooker's release from the

hospital. ECF No. 47-8 at 5. Sills testified that Price had responded in the negative when asked

whether Brooker could return to the Eleventh Street Tower. *Id.* According to Sills, Price stated

that the matter was "out of [her] hands" because the eviction notice had already been posted. *Id.*

Brooker evidently decided to leave the facility after the meeting. *Id.* On June 3, 2010, she

provided the Authority with written notice of her intent to vacate her apartment. ECF No. 53-24

at 2.

The decision awarding Social Security disability benefits to Brooker was based entirely

on the existence of mental impairments. ECF No. 53-1 at 7-8. No physical limitations were

found. *Id.* at 8. Johns and Price have both submitted affidavits declaring that they had no

specific knowledge about the nature of Brooker's disability at the time of her eviction. ECF No.

53-5 at 2, ¶ 13; ECF No. 62-5 at 1, ¶ 5. The inquiry, however, does not end there. The quantum

of information that Brooker needed to provide about her disability must be judged in relation to

the facts already known to the Authority. *Conneen v. MBNA America Bank, N.A.*, 334 F.3d 318,

332 (3d Cir. 2003). Holsinger apparently convinced Brooker to voluntarily go to the hospital for

a psychiatric evaluation. ECF No. 47-3 at 78. Price saw emergency medical personnel transport

Brooker from the Eleventh Street Tower to an ambulance. ECF No. 62-5 at 2, ¶ 7. Johns knew

that Brooker had been taken to the hospital when she approved Holsinger's decision to initiate

19

the eviction process. ECF No. 47-2 at 55. Shortly after the incident, Sills contacted Price and stated that the incident had been triggered by Brooker's failure to adhere to her medication regimen. ECF No. 62-5 at 2, ¶ 9. Sills also asked whether anything could be done to facilitate Brooker's return to the Eleventh Street Tower. *Id.* Given that the Authority was fully aware of Brooker's psychotic episode and hospitalization when the eviction decision was made, it "had more than enough information" to be placed on notice that a direct connection existed between her mental condition and the conduct leading to her eviction. *Taylor v. Phoenixville School District*, 184 F.3d 296, 313-314 (3d Cir. 1999). Indeed, Symons' email to Raley suggested that Price had already discussed the possibility of rescinding the eviction in the event that Brooker's actions were attributable to a "medical problem." ECF No. 53-21 at 2. An individual seeking reasonable accommodations for a disability need not use "magic" words. *Boston Housing Authority v. Bridgewaters*, 898 N.E.2d 848, 859 (Mass. 2009). A generalized request for assistance conveyed by a close family member is ordinarily sufficient. *Taylor*, 184 F.3d at 313. Sills' conversation with Price could reasonably be construed as a request for accommodations. ECF No. 62-5 at 2, ¶ 9.

The letter posted on Brooker's door informed her of her right to request an "informal conference" within fourteen days of her receipt of the eviction notice. ECF No. 53-22 at 3. Brooker never filed such a request. The informal hearing requested by Brooker in September 2010 related to the denial of her application for Section 8 rental assistance rather than to her eviction from the Eleventh Street Tower. ECF No. 53-26 at 2-3. During her deposition, however, Brooker expressed confusion about that distinction. She expressed a belief that the hearing had been conducted to determine whether she could return to the Eleventh Street Tower. ECF No. 47-1 at 96. Sills testified that Brooker had expressed an intention to leave the facility

20

after their meeting with Price. ECF No. 47-8 at 5. Holsinger testified that she had met with Brooker and Sills shortly after Brooker's release from the hospital, and that they had informed her of Brooker's decision to vacate the facility within thirty days. ECF No. 47-3 at 91-92. When questioned about the conversation, Holsinger stated that Sills had thanked her "for being kind and helpful" to Brooker. ECF No. 47-3 at 92. Johns testified that nobody had informed her of a request to accommodate Brooker's disability. ECF No. 47-2 at 60.

On the basis of the existing record, the Court cannot determine as a matter of law whether Brooker's representations to the Authority manifested an intention to obtain accommodations for her disability. That issue presents a question of fact. *Conneen*, 334 F.3d at 331. It is undisputed that Brooker was seeking alternative living arrangements prior to her psychotic episode. ECF No. 47-1 at 40-42; ECF No. 53-17 at 2. Sills apparently told Holsinger that Brooker intended to vacate the Eleventh Street Tower in compliance with the eviction notice without expressing disagreement with the Authority's decision or conveying a request for reconsideration. ECF No. 47-3 at 90-92. On the other hand, the timing of Brooker's departure was clearly dictated by her psychotic episode and the Authority's rapid decision to terminate her lease. ECF No. 62-5 at 2, ¶ 8. During the course of Brooker's hospitalization, Sills asked Price whether Brooker could return to her apartment after her release from the hospital. *Id.* at 2, ¶ 9. That conversation included a discussion about Brooker's medications. *Id.* After conferring with Holsinger, Price informed Sills that the matter was "out of [her] hands." ECF No. 47-8 at 5; ECF No. 62-5 at 2, ¶ 10. Price's representation apparently prompted Brooker's departure from the Eleventh Street Tower. *Id.* In light of the conflicting inferences that could reasonably be drawn from the relevant testimonial evidence, there is a "genuine dispute" as to whether the Authority knew or

reasonably should have known of   Brooker's desire and need to have her disability accommodated. FED. R. CIV. P. 56(a).

The remaining question is whether the evidentiary record could support a finding that the Authority's decision to evict Brooker was unlawful. The FHAA was enacted for the purpose of ending the unnecessary exclusion of handicapped individuals from the American mainstream. *Helen L. v. DiDario*, 46 F.3d 325, 333, n. 14 (3d Cir. 1995). It affirmatively requires covered entities "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped person an] equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Nonetheless, the FHAA does not "require[] that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others." 42 U.S.C. § 3604(f)(9). Courts discussing the relationship between these statutory provisions have held that a public housing agency must consider whether a "reasonable accommodation" would alleviate the "threat" posed by a tenant *before* effectuating his or her eviction. *Roe v. Housing Authority of the City of Boulder*, 909 F.Supp. 814, 822-823 (D.Colo. 1995). Although a covered agency or landlord need not "carry out" a "requested accommodation" in order to demonstrate its futility, the FHAA is violated whenever a tenant whose disability could have been reasonably accommodated is nevertheless evicted on the basis of conduct attributable to his or her disabling impairments. *Douglas v. Kriegsfeld Corp.*, 884 A.2d 1109, 1125-1126 (D.C. Cir. 2005). The eviction of a handicapped tenant in response to such conduct is permitted under the FHAA only where no "reasonable accommodation" can "eliminate or acceptably minimize the risk" that he or she poses. *Roe v. Sugar River Mills Associates*, 820 F.Supp. 636, 639-640 (D.N.H. 1993). A public housing agency runs the risk of

22

violating the applicable statutory provisions when it proceeds to evict a disabled tenant without making an "individualized assessment" of the relevant factors. *Bridgewaters*, 898 N.E.2d at 861.

The terms of Brooker's lease agreement required her to safeguard the Authority's property, refrain from conduct jeopardizing the safety of others, and permit other tenants to experience the "peaceful enjoyment" of their living arrangements. ECF No. 53-22 at 2-3. Johns authorized Brooker's eviction on the ground that her behavior on May 20, 2010, had constituted a breach of those obligations. ECF No. 47-2 at 55. The eviction was apparently approved on the theory that Brooker's conduct had posed a "direct threat" to the welfare of others. ECF No. 53-5 at 3, ¶ 18. During her deposition, Johns responded in the affirmative when asked whether the eviction decision had been made without regard to whether a reasonable accommodation could have eliminated any "threat" posed by Brooker's continued residency in the Eleventh Street Tower. ECF No. 47-2 at 137. In her affidavit, Price declared that Johns had refused to reconsider her decision after learning of Sills' inquiry. ECF No. 62-5 at 2, ¶ 10. On the basis of this evidence, a reasonable trier of fact could conclude that the Authority declined to assess the risks posed by Brooker's tenancy on an individualized basis and refused to consider Sills' implicit request for accommodations.

A plaintiff attempting to establish a violation of the FHAA, the Rehabilitation Act or the ADA must demonstrate that his or her disability could have been reasonably accommodated. See *Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 233-235 (3d Cir. 2000). The reasonableness of a proposed accommodation is a question of fact. *Buskirk v. Apollo Metals*, 307 F.3d 160, 170-171 (3d Cir. 2002). When the failure of a public housing agency to conduct the "individualized assessment" contemplated under the applicable regulations results in the eviction of an individual whose handicap or disability could have been reasonably

23

accommodated, an actionable statutory violation occurs. *Sinisgallo*, 865 F.Supp.2d at 336. This principle flows from the fact that a covered entity's refusal to reasonably accommodate the needs of handicapped and disabled individuals constitutes a prohibited form of "discrimination." *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 729, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995). No violation occurs, however, if an individual's disability could not have been reasonably accommodated in any event. *Mengine v. Runyon*, 114 F.3d 415, 420-421 (3d Cir. 1997). The statutes requiring covered entities to accommodate the needs of disabled individuals do not "demand action beyond the realm of the reasonable." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002).

"Failure-to-accommodate" claims arising in the housing context must be considered in accordance with a burden-shifting framework. *Sharpvisions, Inc. v. Borough of Plum*, 475 F.Supp.2d 514, 526 (W.D.Pa. 2007). The contours of that framework were established by the United States Court of Appeals for the Third Circuit in *Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096 (3d Cir. 1996), and *Lapid-Laurel, L.L.C. v. Zoning Board of Adjustment*, 284 F.3d 442 (3d Cir. 2002). In *Hovsons*, the Court of Appeals held that a defendant alleged to have violated the FHAA by failing to accommodate a handicapped person's disability bears the burden of establishing the unavailability or unreasonableness of an accommodation that would have enabled that person to use and enjoy a dwelling on terms equal to others. *Hovsons*, 89 F.3d at 1103-1104. The Court of Appeals later explained, in *Lapid-Laurel*, that "the plaintiff bears the initial burden of showing that the requested accommodation is necessary to afford handicapped persons an equal opportunity to use and enjoy a dwelling, at which point the burden shifts to the defendant to show that the requested accommodation is unreasonable." *Lapid-Laurel*, 284 F.3d at 457.

24

In order to satisfy her initial burden, Brooker must establish a nexus between the reasonable accommodations that she was seeking and their necessity for affording her an equal opportunity to enjoy public housing. *McKivitz v. Township of Stowe*, 769 F.Supp.2d 803, 825-826 (W.D.Pa. 2010). A proposed accommodation cannot be said to be "necessary" if it "provides no direct amelioration of a disability's effect." *Bryant Woods Inn, Inc. v. Howard County*, 124 F.3d 597, 604 (4th Cir. 1997). Sills allegedly contacted the Authority shortly after the incident of May 20, 2010, and asked whether Brooker could remain a resident of the Eleventh Street Tower if her medications were to be monitored on a daily basis. ECF No. 1 at ¶ 46. In her affidavit, Price described a conversation in which Sills had attributed Brooker's conduct to her failure to take her medications as prescribed. ECF No. 62-5 at 2, ¶ 9. Price apparently relayed Sills' comments to Holsinger, who stated that the Authority would not reconsider its decision to evict Brooker. *Id.* at 2, ¶ 10.

Brooker was taking Cymbalta for her depression during the spring of 2010. ECF No. 47-1 at 6. Until March 2010, Betsy Kline ("Kline") served as Brooker's treating therapist. *Id.* at 46. When Brooker arrived for a scheduled appointment on March 4, 2010, she saw Scheeler instead of Kline. *Id.* at 51. Scheeler evidently assumed Kline's prior responsibilities in relation to Brooker. *Id.* On that occasion, Brooker was provided with a renewed prescription for Cymbalta. ECF No. 47-9 at 102.

During that same period of time, Brooker was told by a treating physician[10] that her Cymbalta had been elevating her blood pressure. ECF No. 47-1 at 55. Brooker testified that she had stopped taking Cymbalta roughly two weeks before her psychotic episode. *Id.* Although she attempted to get an appointment with Scheeler to discuss the situation, she apparently

---

[10] During her deposition, Brooker referred to the physician as "Dr. Finchman." ECF No. 47-1 at 54-55.

25

discontinued the Cymbalta on her own because her blood pressure was "sky high." *Id.* at 56-59. Brooker stated that Sills had advised her to stop taking Cymbalta. *Id.* at 59.

The psychotic episode leading to Brooker's eviction occurred on May 20, 2010. ECF Nos. 46 & 52 at ¶ 22. Dr. Joseph L. Antonowicz discontinued Brooker's prescription for Cymbalta during her stay at Altoona Regional. ECF No. 47-9 at 96, 129. Other prescriptions were provided to address her mental condition. ECF No. 53-36 at 2. It was determined that Brooker was suffering from a urinary tract infection. ECF No. 47-9 at 8, 39. Bactrim was prescribed to clear the infection. *Id.* at 67, 90. After taking Bactrim, Brooker was no longer experiencing psychotic symptoms. *Id.* at 90.

Scheeler testified that Brooker's unilateral decision to discontinue her Cymbalta had caused her to have delusions. *Id.* at 5-6. When asked about the impact that the urinary tract infection may have had on Brooker's behavior, Scheeler stated that an individual with a pre-existing "mental health diagnosis" could be "thrown over the edge" by such an infection "a lot easier" than someone exhibiting a normal mental condition. *Id.* at 90. She also explained that urinary tract infections were known to cause delusional behavior in elderly patients. *Id.* at 118. Brooker did not take Cymbalta in the aftermath of her hospitalization. ECF No. 47-1 at 81. As of September 28, 2011,[11] Brooker was not taking any medications for her depression. ECF No. 47-9 at 35. She was, however, taking Ativan for symptoms attributable to anxiety. *Id.* at 47.

The Defendants question the admissibility of Scheeler's testimony under Federal Rule of Evidence 702. ECF No. 51 at 16-19. Evidence that would be inadmissible at trial cannot be considered in determining whether summary judgment should be entered for or against a particular party. *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961, n.1 (3d Cir. 1996). The testimony of an expert witness must be based on "knowledge" rather than on his or her

---

[11] September 28, 2011, was the date of Scheeler's deposition. ECF No. 47-9 at 1.

"subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589-590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Defendants maintain that Scheeler's testimony was impermissibly speculative because she could not state with certainty whether Brooker's psychotic episode had been triggered by the discontinuation of her Cymbalta, her urinary tract infection, or a combination of the two. ECF No. 51 at 16-19.

The argument advanced by the Defendants is unavailing. Much of Scheeler's testimony related to Brooker's responses to various forms of prescribed treatment. With respect to those matters, Scheeler testified as a fact witness rather than as an expert witness. *United States v. Olhovsky*, 562 F.3d 530, 544 (3d Cir. 2009). As a treating CRNP, Scheeler was competent to testify about her treatment of Brooker, Brooker's symptoms during the course of that treatment, and the manner in which those symptoms were addressed. *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 159, n.8 (3d Cir. 1999). Scheeler had "particularized knowledge by virtue of her experience" as a treating healthcare provider. *Donlin v. Philips Lightning North America Corp.*, 581 F.3d 73, 81 (3d Cir. 2009). Therefore, she was competent to provide testimony about the "specialized or technical" subject of how mentally ill patients typically react to urinary tract infections.[12] *Id.*

Scheeler testified that "an existing mental health diagnosis ma[de Brooker] more susceptible to the psychotic symptoms" of a urinary tract infection than an infected individual without a pre-existing mental condition. ECF No. 47-9 at 8-9. It is undisputed that Brooker had such an infection when she was hospitalized. *Id.* at 39. The infection was successfully treated with Bactrim. *Id.* at 90. It is also clear from the record that Brooker stopped taking her

---

[12] The impact that a urinary tract infection can have on the health of an individual with a pre-existing mental condition was apparently known to Price and Symons on the date of Brooker's psychotic episode. ECF No. 53-21 at 2. Price evidently told Symons that Brooker's eviction would be rescinded if her conduct was later shown to have been caused by a urinary tract infection. *Id.*

27

Cymbalta roughly two weeks before her psychotic episode.  ECF No. 47-1 at 55.  Her

prescription for Cymbalta was permanently discontinued during her hospitalization.  ECF No.

47-9 at 129.  Scheeler explained that, in the aftermath of her hospitalization, Brooker had been

more anxious than depressed, necessitating the provision of Ativan rather than an antidepressant.

*Id.* at 34, 47.  When asked about the likelihood of another psychotic episode, Scheeler stated that

Brooker's delusional behavior could recur if she were to stop taking her medications "for any

length of time."  *Id.* at 7.

      The Defendants argue that since Brooker no longer takes medication for her depression,

the proposed monitoring of her medication regimen cannot be linked to her "disability."  ECF

No. 51 at 19-20.  There are several problems with this argument.  First of all, the "handicap" or

"disability" entitling Brooker to statutory protection is not limited to "depression."  It broadly

encompasses all of her mental impairments, which collectively impose substantial limitations on

her major life activities.[13]  29 U.S.C. § 705(20)(B); 42 U.S.C. §§ 3602(h)(1), 12102(1)(A)(1).

The inquiry cannot be limited to a single impairment or medication.  Second, Scheeler testified

that Brooker had been depressed on March 4, 2010, and that Cymbalta had been prescribed for

her at that time.  ECF No. 47-9 at 31-32.  Scheeler went on to say that while Brooker did not

need an antidepressant at all times, her "major depressive disorder" was a recurring problem that

could manifest itself again in the future.[14]  *Id.* at 34.  In the event that Brooker needs to restart

her treatment for depression, her future adherence to her medication regimen could certainly be

relevant to whether her residency at the Eleventh Street Tower "would constitute a direct threat

to the health or safety of other individuals" or "result in substantial physical damage to the

---

[13] The decision awarding Social Security disability benefits to Brooker was based on a determination that she was
suffering from dysthymia, a generalized anxiety disorder, and a personality disorder.  ECF No. 53-1 at 7.

[14] Under the ADA Amendments Act, "[a]n impairment that is episodic or in remission is [considered to be] a
disability if it would substantially limit a major life activity when active."  42 U.S.C. § 12102(4)(D).

property of others." 42 U.S.C. § 3604(f). Furthermore, the Authority would not necessarily prevail if it could conclusively discount the impact of medication monitoring in this case. If the psychotic episode is found to have been caused by a combination of Brooker's mental impairments and her urinary tract infection, a direct link between that incident and her underlying disability could still be established. ECF No. 47-9 at 8-9. In that event, the successful treatment of the urinary tract infection may have eliminated any "direct threat" posed by Brooker's continued tenancy, thereby requiring the Authority to depart from its policy of evicting tenants who engage in conduct of the kind engaged in by Brooker on May 20, 2010. *Bridgewaters*, 898 N.E.2d at 859. If Brooker's pre-existing disability made her "more susceptible to the psychotic symptoms" associated with urinary tract infections, the fact that such an infection may have thrown her "over the edge" would not necessarily negate the causal relationship between her disability and her psychotic episode.[15] ECF No. 47-9 at 8-9, 90.

At some point after the commencement of this action, Brooker's attorneys apparently asked the Authority to reconsider its eviction decision on the condition that the provision of her medications be monitored. In an affidavit, Johns declared that she had rejected that request because the "proposed accommodation d[id] not relate to Brooker's disability," and because "Brooker would still pose a direct threat to other residents." ECF No. 53-5 at 3, ¶ 18. Johns further stated that the Authority did not employ a medical staff that was capable of ensuring that Brooker would take her prescribed medications. *Id.* at 3, ¶ 20. The Authority appears to be offering Johns' affidavit in order to establish, at this stage, that Brooker's proposed accommodation would be "unreasonable" as a matter of law. *Hovsons*, 89 F.3d at 1102-1104.

---

[15] Brooker must establish that her behavior on May 20, 2010, was attributable to her "handicap" or "disability" in order to qualify for statutory protection under the FHAA, the Rehabilitation Act and the ADA. *Sinisgallo v. Town of Islip Housing Authority*, 865 F.Supp.2d 307, 339-341 (E.D.N.Y. 2012).

The position advanced by the Defendants misses the mark for two reasons. First of all, the Court understands the suggested accommodation of medication monitoring to be based on duties imposed primarily on members of Brooker's own family. ECF No. 1 at ¶ 46. It is difficult to fathom how the Authority would incur unreasonable costs and administrative burdens by permitting Sills and her husband to periodically monitor Brooker's compliance with her medication regimen. *Bridgewaters*, 898 N.E.2d at 861, n.26. Second, the accommodation requested by Brooker arguably constituted a broader, implicit request that she be given a second chance to conform her conduct to the Authority's expectations and the terms of her lease agreement. In her affidavit, Price stated that Sills had asked whether there was *anything* that could be done to facilitate Brooker's return to the Eleventh Street Tower after her release from the hospital. ECF No. 62-5 at 2, ¶ 9. If Brooker's return to the facility after the successful treatment of her medical condition would not have threatened the welfare of other tenants, a "probationary period" of continued residency was potentially warranted under the circumstances of this case. *Sinisgallo*, 865 F.Supp.2d at 341-342. The request for accommodations was clearly refused when the Authority declined to reconsider its eviction decision. ECF No. 62-5 at 2, ¶ 10. Given the present state of the record, the Court cannot conclude as a matter of law that the Defendants' conduct in relation to Brooker was in conformity with the FHAA, the Rehabilitation Act and the ADA.

Brooker appears to partially base her discrimination claims on the Authority's dismissal of her request for Section 8 rental assistance. ECF No. 1 at ¶¶ 73-75. Walter testified that she had withdrawn the Section 8 application on the basis of the eviction without knowing why Brooker had been evicted. ECF No. 47-4 at 63, 68-74. The reason for the eviction apparently became known to Walter when Brooker requested an informal hearing before Muriceak. *Id.* at

74. Muriceak testified that Brooker's attorney had asked for unspecified accommodations at the hearing. ECF No. 47-5 at 41. He went on to state that the issue of reasonable accommodations had not been properly before him, and that a request for such accommodations should have been made as a direct challenge to the eviction itself. *Id.* at 41-42. In a subsequent affidavit, Muriceak declared that he had affirmed the denial of Brooker's Section 8 application because she had been evicted, without considering the legality or propriety of the eviction decision. ECF No. 53-29 at 3-4, ¶¶ 7-10, 15. During her deposition, Walter likewise stated that since Brooker had not directly challenged her eviction from the Eleventh Street Tower, the question before Muriceak had been limited to the *fact* of Brooker's eviction. ECF No. 47-4 at 80-81.

A public housing agency may reject a hearing officer's decision that is deemed to be contrary to federal, state or local law. 24 C.F.R. § 966.57(b)(2). Walter acknowledged that the Authority had been free to reject Muriceak's decision. ECF No. 47-4 at 84-85. Nonetheless, she testified that she had decided to follow the decision in this instance. *Id.* at 86. Walter explained that Brooker's eviction from the Eleventh Street Tower had necessitated the denial of her application for Section 8 rental assistance, and that no further inquiries had been necessary. *Id.* at 109. The impetus for Brooker's eviction apparently played no role in Walter's decision. *Id.* at 110-111. Walter reiterated her position in a subsequent affidavit. ECF No. 53-9 at 4, ¶ 20. Johns testified that she had delegated to Walter the authority to make final decisions relating to Section 8 applications. ECF No. 47-2 at 54.

In *Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277, 1284 (3d Cir. 1993), the United States Court of Appeals for the Third Circuit held that a public housing agency's "refusal to pay for a given housing unit, even if influenced by bias against the handicapped," did not constitute a violation of the FHAA. It is not clear whether the holding in *Growth Horizons*

31

sweeps broadly enough to preclude a handicapped plaintiff such as Brooker from invoking the FHAA to challenge a public housing agency's denial of an application for Section 8 rental assistance. *Spieth v. Bucks County Housing Authority*, 594 F.Supp.2d 584, 592 (E.D.Pa. 2009)(expressing uncertainty as to whether *Growth Horizons* forecloses a handicapped plaintiff from bringing a claim under the FHAA on the basis of a public housing agency's denial of a voucher application). The reasoning employed in *Growth Horizons* has no bearing on the claims arising under the Rehabilitation Act and the ADA, since those statutes are not limited to the housing context. *Growth Horizons*, 983 F.2d at 1283 (observing that the FHAA was never "intended to regulate and thereby subject to judicial review the decision-making of public agencies which sponsor housing for the disabled").

A public entity covered by the Rehabilitation Act and the ADA must "make reasonable modifications in policies, practices, or procedures [that] are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the [relevant] service, program, or activity." 28 C.F.R. § 35.130(b)(7). In this vein, the Authority's rigid adherence to its policy of denying Section 8 rental assistance to those who have been evicted from public housing within the previous five years arguably constituted a statutory violation separate and distinct from that occasioned by Brooker's eviction. The applicable regulation provides that a decision to deny or terminate an individual's assistance must be made in conformity with the "reasonable accommodation" requirements existing under federal law. 24 C.F.R. § 982.552(c)(2)(iv). This requirement applies with equal force to a public housing agency's decision to withdraw the name of a disabled individual from its waiting list. 24 C.F.R. § 982.204(c)(2).

As discussed earlier, however, genuine issues of material fact preclude a determination as to whether the Authority's decision to evict Brooker constituted a violation of her statutory rights. The testimony given by Walter and Muriceak establishes a direct causal relationship between the eviction and the withdrawal of Brooker's application for Section 8 rental assistance. ECF No. 47-4 at 63, 68-74; ECF No. 53-29 at 3-4, ¶¶ 7-10, 15. A determination that the eviction was unlawful would similarly establish that the application should not have been dismissed. On the other hand, the Authority was free to dismiss Brooker's application for Section 8 rental assistance on the basis of a *lawful* eviction occurring within the previous five years. 24 C.F.R. § 982.552(c)(1)(ii). Because a direct causal relationship existed between the eviction and the denial of the Section 8 application, any damages attributable to the denial can be traced back to the eviction. *McKivitz*, 769 F.Supp.2d at 820 (explaining that "a statutory violation occurs as soon as a request for a federally-mandated 'reasonable accommodation' is denied, regardless of whether state law permits the requested relief to be sought in subsequent judicial proceedings"). Under these circumstances, the Court has no occasion to consider whether the decision in *Growth Horizons* would otherwise preclude Brooker from directly challenging the dismissal of her application under the FHAA. The eviction decision was unquestionably governed by the terms of that statute. 42 U.S.C. § 3604(f). If that decision was unlawful, Brooker will be able to recover for any resulting damages, including those stemming from the denial of her Section 8 application. 42 U.S.C. § 3613(c)(1); *Baltimore Neighborhoods, Inc. v. Lions Gate Garden Condominiums, Inc.*, 92 F.Supp.2d 456, 463-464 (D.Md. 2000). In the event that *Growth Horizons* has an impact on this case that is not readily apparent, the parties remain free to advance any relevant arguments at a later time.

33

Because genuine issues of material fact exist relating to the clarity of Brooker's communications with the Authority and the nature of the threat that her continued residency at the Eleventh Street Tower may have posed to other tenants, the parties' cross-motions for summary judgment will be denied with respect to the claims arising under the FHAA, the Rehabilitation Act and the ADA. ECF Nos. 44 & 50. No opinion is expressed as to whether Brooker's interactions with Authority personnel manifested an intent to obtain reasonable accommodations for her disability, whether her psychotic episode was caused by that disability, or whether she would have posed a "direct threat" to other tenants if she had been permitted to remain a resident of the Eleventh Street Tower. Those issues will be more appropriately resolved by the trier of fact.

## B.    The Housing Act Claims

The Assistant Secretary for Public and Indian Housing[16] has promulgated regulations implementing the Department's obligations under the Section 8 program. One of those regulations *requires* a participating public housing agency to "terminate program assistance for a family evicted from housing assisted under the program for [a] serious violation of [its] lease" agreement. 24 C.F.R. § 982.552(b)(2). A separate regulation, which is found at 24 C.F.R. § 982.552(c)(1)(ii), *permits* a public housing agency to "deny program assistance" to an individual who "has been evicted from federally assisted housing in the last five years." On September 3, 2010, the Authority withdrew Brooker's application for Section 8 rental assistance on the ground that she had been "[e]victed from the Eleventh Street Tower." ECF No. 53-25 at 2. Muriceak affirmed the Authority's decision on November 10, 2010, after hearing testimony provided by Brooker and Walter. ECF No. 47-25. Although Walter was not bound by Muriceak's decision,

---

[16] The powers of the Secretary of Housing and Urban Development may be delegated to subordinate officers. 42 U.S.C. § 3535(d).

34

she decided to follow it. 24 C.F.R. § 966.57(b)(2); ECF No. 47-4 at 84-86. Brooker appealed

that decision to the Court of Common Pleas on December 10, 2010. ECF No. 53-40 at 2-7. She

discontinued the appeal shortly before the commencement of this action. ECF No. 53-33 at 2;

ECF No. 53-34 at 2.

The withdrawal of Brooker's application was not predicated on a determination that she

had committed a "serious violation" of her lease agreement. 24 C.F.R. § 982.552(b)(2); ECF

No. 53-25 at 2. Therefore, the Authority's dismissal of the application was discretionary in

nature. *Rayburn v. City of Phoenix Housing Dept.*, Civil Action No. 06-1590, 2008 WL

8871872, at *3-4, 2008 U.S. Dist. LEXIS 123675, at *10-12 (D.Ariz. Apr. 29, 2008).

Attempting to show that the Authority's action was not *permissible*, Brooker contends that she

was never "evicted" from the Eleventh Street Tower. ECF No. 1 at ¶ 71. Her position is based

on 24 C.F.R. § 966.4(l)(4), which provides:

> (4) *How tenant is evicted.* The PHA may evict the tenant from the unit either:
> (i) By bringing a court action or;
> (ii) By bringing an administrative action if law of the jurisdiction permits eviction
> by administrative action, after a due process administrative hearing, and without a
> court determination of the rights and liabilities of the parties. In order to evict
> without bringing a court action, the PHA must afford the tenant the opportunity
> for a pre-eviction hearing in accordance with the PHA grievance procedure.

24 C.F.R. § 966.4(l)(4). Brooker maintains that since she responded to Price's notice by

vacating her apartment *before* the commencement of a "court action," she was not "evicted"

within the meaning of § 966.4(l)(4). ECF No. 45 at 11-14.

Relying on *Banks v. Housing Authority of the City of Omaha*, 795 N.W.2d 632 (Neb.

2011), the Defendants argue that Brooker's displacement from the Eleventh Street Tower

constituted an "eviction" within the meaning of § 982.552(c)(1)(ii). ECF No. 51 at 10-12. In

*Banks*, the Nebraska Supreme Court was presented with a situation in which a Section 8

beneficiary had lost his Section 8 housing benefits because of a prior "eviction" triggered by his commission of criminal acts. *Banks*, 795 N.W.2d at 633-634. The beneficiary, who had moved out of public housing before a hearing was held in connection with an underlying "restitution action," asserted that he had not been "evicted." *Id.* at 633-635. The Nebraska Supreme Court observed that the former tenant had essentially mooted the restitution action by moving out of his housing unit. *Id.* at 637. The question of whether the individual had been "evicted" was not directly confronted, since the Nebraska Supreme Court determined that his underlying criminal activity had provided the relevant public housing agency with an independent basis for terminating his Section 8 benefits. *Id.* The reasoning employed in *Banks*, however, suggests that it "would frustrate the intent of federal housing laws" to permit a public housing tenant to avoid the consequences of an "eviction" by taking actions to render a formal proceeding moot. *Id.* at 635.

It is undisputed that a "notice to quit" was placed on the door to Brooker's apartment. ECF No. 53-22 at 2-3. That is the first step that must be taken by "[a] landlord desirous of repossessing real property from a tenant." 68 PA. STAT. § 250.501(a). At least one Pennsylvania court has referred to the service of a "notice to quit" as the initiation of "eviction proceedings." *Pleasant Hill Estates Associates v. Milovich*, 33 Pa. D. & C. 4th 74, 76 (Ct.Comm.Pl. Dauphin Cty. 1996). Although the regulations relied upon by Brooker describe the process that must be followed to "evict" a tenant who wishes to remain in his or her residence, it is not clear whether the completion of that process is necessary to a finding that he or she has been "evicted" for purposes of § 982.552(c)(1)(ii). That issue need not be resolved in this case, since Brooker's claims under the Housing Act are deficient for other reasons.

No express or implied right of action arises directly under the Housing Act. *Reyes-Garay v. Integrated Assurance Co.*, 818 F.Supp.2d 414, 429-430 (D.P.R. 2011). Brooker is presumably trying to bring her Housing Act claims pursuant to 42 U.S.C. § 1983, which provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. The United States Supreme Court has construed the phrase "and laws" to mean that § 1983 provides a remedy to individuals aggrieved by violations of their federal statutory rights. *Maine v. Thiboutot*, 448 U.S. 1, 4-8, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). The Supreme Court has also stated, however, that "§ 1983 does not provide an avenue for relief every time a state actor violates a federal law." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005). A plaintiff proceeding under § 1983 must allege a violation of a federal *right* arising under a statute designed to benefit a class of persons to which he or she belongs. *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). The right upon which the plaintiff's claim is premised must not be "so 'vague and amorphous' that its enforcement would strain judicial competence." *Id.* at 340-341, quoting *Wright v. City of Roanoke Redevelopment & Housing Authority*, 479 U.S. 418, 431, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987). Furthermore, "the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms," thereby "impos[ing] a binding obligation on the States."[17] *Blessing*, 520 U.S. at 341.

---

[17] Even when this inquiry points in favor of a determination that violations of a particular right can be redressed under § 1983, the existence of a comprehensive enforcement mechanism within the statute creating that right may demonstrate that Congress "intended to supplant any remedy that otherwise would be available under § 1983." *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 20-21, 101 S.Ct. 2615, 69

There are undoubtedly circumstances in which a litigant can invoke § 1983 to remedy the violation of a right conferred under the Housing Act. *Robinson v. District of Columbia Housing Authority*, 660 F.Supp.2d 6, 11 (D.D.C. 2009). In *Wright v. City of Roanoke Redevelopment Housing Authority*, 479 U.S. 418, 429-430, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), the Supreme Court held that § 1983 could be utilized to redress violations of Housing Act provisions limiting the amount of rent that tenants could be charged to thirty percent of their income. Because the rent ceiling created by the Housing Act constituted "a mandatory limitation focusing on the individual family and its income," it was deemed to be the source of a federal right enforceable under § 1983. *Wright*, 479 U.S. at 430. The holding in *Wright* was premised on the fact that the relevant statutory language had been crafted in a clear and unambiguous manner. *Sabree v. Richman*, 367 F.3d 180, 184-185 (3d Cir. 2004)(discussing the Supreme Court's analysis in *Wright*).

The rent ceiling found to be enforceable in *Wright* appears directly in the text of the Housing Act. 42 U.S.C. § 1437a(a)(1). Brooker's claims differ in that they are based on regulations promulgated by the Department pursuant to its authority to administer the Housing Act. ECF No. 1 at ¶¶ 12-24, 71. However, in *Farley v. Philadelphia Housing Authority*, 102 F.3d 697, 699 (3d Cir. 1996), the United States Court of Appeals for the Third Circuit held that a private litigant could bring an action under § 1983 to redress violations of a regulation that "merely interprets" a provision of the Housing Act creating enforceable rights. Consequently, Brooker's Housing Act claims cannot be dismissed solely on the ground that they are based on regulations rather than on statutory provisions.

---

L.Ed.2d 435 (1981). Because § 1983 is a statutory remedy, Congress has the authority to foreclose its invocation in particular cases. *Smith v. Robinson*, 468 U.S. 992, 1005, n. 9, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984).

In *Alexander v. Sandoval*, 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001),

the Supreme Court declared that "private rights of action to enforce federal law must be created

by Congress." Speaking through Justice Scalia, the Supreme Court went on to state as follows:

> Language in a regulation may invoke a private right of action that Congress
> through statutory text created, but it may not create a right that Congress has not.
> Thus, when a statute has provided a general authorization for private enforcement
> of regulations, it may perhaps be correct that the intent displayed in each
> regulation can determine whether or not it is privately enforceable. But it is most
> certainly incorrect to say that language in a regulation can conjure up a private
> cause of action that has not been authorized by Congress. Agencies may play the
> sorcerer's apprentice but not the sorcerer himself.

*Alexander*, 532 U.S. at 291 (internal citation omitted). Shortly after the decision in *Alexander*

was issued, the United States Court of Appeals for the Third Circuit held that a "federal

regulation alone" could not create a right enforceable under § 1983. *South Camden Citizens in

Action v. New Jersey Department of Environmental Protection*, 274 F.3d 771, 790 (3d Cir.

2001).

The Supreme Court decided *Gonzaga University v. Doe*, 536 U.S. 273, 122 S.Ct. 2268,

153 L.Ed.2d 309 (2002), six months later. That decision clarified that "where the text and

structure of a statute provide no indication that Congress intends to create new individual rights,

there is no basis for a private suit, whether under § 1983 or under an implied right of action."

*Gonzaga University*, 536 U.S. at 286. The Supreme Court went on to declare that "if Congress

wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous

terms—no less and no more than what is required for Congress to create new rights enforceable

under an implied private right of action." *Id.* at 290. The standard adopted in *Gonzaga

University* confirms that the Supreme Court's "implied right of action cases should guide the

determination of whether a statute confers rights enforceable under § 1983." *Id.* at 283.

Claims arising under § 1983 differ from claims brought pursuant to an implied right of action in one respect.  Unlike a plaintiff asserting a claim arising under an implied right of action, a plaintiff proceeding under § 1983 need not independently establish the existence of a private *remedy*.  *Newark Parents Association v. Newark Public Schools*, 547 F.3d 199, 205 (3d Cir. 2008).  Although the *right* to be enforced must be created by a separate statute, § 1983 itself "provides the remedy through which that right is vindicated."  *Id.*  The standard enunciated in *Gonzaga University* governs only "the initial inquiry" as to "whether a statute confers any right at all."  *Gonzaga University*, 536 U.S. at 284-285.  In the present context, the relevant question is whether the provisions of the Housing Act relied upon by Brooker "unambiguously confer a substantive right" on individuals in her position.  *Grammer v. John J. Krane Regional Centers*, 570 F.3d 520, 527 (3d Cir. 2009).

Brooker's Housing Act claims are clearly based on the regulations defining the term "eviction" and *permitting* public housing agencies to "deny program assistance" to those who have "been evicted from federally assisted housing in the last five years."  24 C.F.R. §§ 966.4(l)(4), 982.552(c)(1)(ii).  These regulations can give rise to right enforceable under § 1983 only if "they construe a personal right" created by the Housing Act itself.  *Three Rivers Center for Independent Living, Inc. v. Housing Authority of the City of Pittsburgh*, 382 F.3d 412, 424 (3d Cir. 2004).  In her brief, Brooker purports to ground her Housing Act claims in 42 U.S.C. § 1437f(o)(6)(B), which provides that a "public housing agency may elect to screen applicants for the program in accordance with such requirements as the Secretary may establish."  ECF No. 45 at 12.  The relevant statutory provision goes on to state that an individual's status as "a victim of domestic violence, dating violence, or stalking is not an appropriate basis for denial of program

assistance or for denial of admission if the applicant otherwise qualifies for assistance or admission." 42 U.S.C. § 1437f(o)(6)(B).

Because § 1437f(o)(6)(B) merely *permits* a public housing agency to "screen applicants for the program" in accordance with requirements that are not specified by statute, it does not "impose a binding obligation on the States." *Lewis v. Alexander*, 685 F.3d 325, 344 (3d Cir. 2012). Moreover, "[s]tatutes that focus on the person regulated rather than [on] the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" *Alexander*, 532 U.S. at 289, quoting *California v. Sierra Club*, 451 U.S. 287, 294, 68 L.Ed.2d 101, 101 S.Ct. 1775 (1981). Although § 1437f(o)(6)(B) arguably confers enforceable rights on "victim[s] of domestic violence, dating violence, or stalking," it does not contain "clear and unambiguous terms" extending similar rights to those who have been denied assistance or admission for other reasons. *Gonzaga University*, 536 U.S. at 290. Given that the regulations relied upon by Brooker do not construe personal rights conferred on her by statute, her Housing Act claims must be dismissed. *Three Rivers Center*, 382 F.3d at 431.

In determining that Brooker cannot invoke § 1983 to enforce "rights" created by the regulations permitting a public housing agency to deny Section 8 benefits to those who have been "evicted from federally assisted housing," the Court is guided by the reasoning employed by the United States Court of Appeals for the Sixth Circuit in *Caswell v. City of Detroit Housing Commission*, 418 F.3d 615 (6th Cir. 2005). The plaintiff in *Caswell* brought a claim under § 1983 against a public housing agency that had allegedly terminated his Section 8 benefits in violation of 24 C.F.R. § 982.311(b), which provides:

> (b) *Termination of payment: When owner terminates the lease.* Housing assistance payments terminate when the lease is terminated by the owner in accordance with the lease. However, if the owner has commenced the process to evict the tenant, and if the family continues to reside in the unit, the PHA must

> continue to make housing assistance payments to the owner in accordance with the HAP contract until the owner has obtained a court judgment judgment or other process allowing the owner to evict the tenant. The PHA may continue such payments until the family moves from or is evicted from the unit.

24 C.F.R. § 982.311(b). It was alleged that the public housing agency had terminated the plaintiff's benefits during the pendency of an eviction proceeding even though he had continued to reside in his apartment. *Caswell*, 418 F.3d at 617. The termination of the plaintiff's benefits apparently occurred because the public housing agency had incorrectly assumed that he had moved out of the apartment after the commencement of the eviction action. *Id.* at 618. Although the plaintiff successfully defended the eviction action and remained in possession of the apartment, the termination of his Section 8 benefits rendered him unable to pay his rent. *Id.* at 617. This chain of events led to a subsequent eviction, causing the plaintiff to be "homeless for a short period of time." *Id.* Relying on the Supreme Court's decisions in *Alexander* and *Gonzaga University*, the Court of Appeals concluded that the plaintiff could not bring a claim under § 1983 to enforce the terms of § 982.311(b). *Id.* at 618-620. The decision in *Caswell* was based on the fact that the "right" contained in § 982.311(b) was untethered from the language of § 1437f(o). *Id.* at 619-620.

The principles discussed in *Caswell* apply with equal force to this case. The Court assumes the validity of the regulations relied upon by Brooker in support of her Housing Act claims. *Alexander*, 532 U.S. at 281-282. The mere fact that the Authority may have contravened valid regulations promulgated by the Department does not mean that its actions can be challenged in a private action arising under § 1983. *South Camden Citizens in Action*, 274 F.3d at 790 (rejecting "the argument that enforceable rights may be found in any valid administrative implementation of a statute that in itself creates some enforceable right"). Since the Housing Act does not afford otherwise qualified individuals a *right* to Section 8 rental assistance unless or

42

until they have been "evicted" within the meaning of the Department's regulations, Brooker's Housing Act claims are not cognizable. *Caswell*, 418 F.3d at 618-620.

No opinion is expressed as to whether Brooker was "evicted" within the meaning of § 982.552(c)(1)(ii). Although that issue may have been dispositive in her appeal to the Court of Common Pleas, it is inconsequential in the present context.[18] As explained earlier, Brooker's challenge to the Authority's dismissal of her application for Section 8 rental assistance remains viable under the FHAA, the Rehabilitation Act and the ADA. 24 C.F.R. § 982.552(c)(2)(iv). The Court holds only that she asserts no cognizable claims based on rights created by the Housing Act itself. The Defendants' motion for summary judgment will be granted with respect to those claims. ECF No. 1 at ¶¶ 12-24, 71.

## C.    The Fourteenth Amendment Claims

Brooker asserts § 1983 claims against the Authority, Johns and Walter for alleged violations of rights secured to her under the Fourteenth Amendment. ECF No. 1 at ¶¶ 25, 72. Section 1 of the Fourteenth Amendment provides:

> All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST., AMEND. XIV, § 1. A plain reading of Brooker's complaint reveals that her constitutional claims are based on the Due Process Clause. ECF No. 1 at ¶¶ 25, 72.

A plaintiff asserting a claim under the Due Process Clause must establish that he or she has been "deprived" of a "liberty" or "property" interest protected by the Fourteenth Amendment. U.S. CONST., AMEND. XIV, § 1. An individual who satisfies the statutory

---

[18] It is worth noting that when Brooker appealed the Authority's decision to the Court of Common Pleas, she claimed that she had been "evicted from public housing." ECF No. 53-40 at 5, ¶ 6.

eligibility requirements for the receipt of government benefits has a property interest in those benefits. *Board of Regents v. Roth*, 408 U.S. 564, 576-578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). It is undisputed that the Authority *intentionally* evicted Brooker from the Eleventh Street Tower and withdrew her application for Section 8 rental assistance. ECF No. 47-4 at 63, 68-74; ECF No. 62-5 at 2, ¶ 8. Neither action was taken by accident. Since the Authority's actions were *deliberate*, Brooker was "deprived" of her "property" for constitutional purposes. *Daniels v. Williams*, 474 U.S. 327, 331-334, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

The Due Process Clause "raises no impenetrable barrier to the taking of a person's possessions." *Fuentes v. Shevin*, 407 U.S. 67, 81, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). "Instead, it merely requires that state-occasioned deprivations of liberty and property interests be effectuated in accordance with 'due process of law.'" *Whittaker v. County of Lawrence*, 674 F.Supp.2d 668, 693 (W.D.Pa. 2009). The essential requirements of "due process" are "notice and an opportunity to respond." *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The "due process" required under the Fourteenth Amendment "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). The Supreme Court has explained that the precise level of "process" required to effectuate a lawful "deprivation" of "liberty" or "property" depends on "the private interest that will be affected by the official action," "the risk of an erroneous deprivation of such interest through the procedures used," the "probable value . . . of additional procedural safeguards," and "the fiscal and administrative burdens that the

44

additional or substitute procedural requirement[s] would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Once the required level of process has been ascertained, "the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of [an individual's] substantive assertions." *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

The Equal Protection Clause of the Fourteenth Amendment does not require the States to "make special accommodations for the disabled." *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 367-368, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). For this reason, the provisions of the FHAA, the Rehabilitation Act and the ADA requiring covered entities to accommodate the needs of disabled individuals have no constitutional parallel. *McKivitz*, 769 F.Supp.2d at 831. In certain instances, however, a State's failure to provide the "reasonable accommodations" required by statute may independently contravene the Fourteenth Amendment. *United States v. Georgia*, 546 U.S. 151, 157-158, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006). The Due Process Clause "requires the States to afford certain civil litigants a 'meaningful opportunity to be heard' by removing obstacles to their full participation in judicial proceedings." *Tennessee v. Lane*, 541 U.S. 509, 523, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004), quoting *Boddie v. Connecticut*, 401 U.S. 371, 379, 28 L.Ed.2d 113, 91 S.Ct. 780 (1971). Regulations promulgated by the Department require public housing agencies to accommodate the needs of disabled individuals participating in administrative hearings. 24 C.F.R. § 966.56(h).

Brooker does not contend that the procedures used by the Authority to remove a tenant from public housing or dismiss an individual's application for Section 8 benefits generally fall below the requirements of the Fourteenth Amendment. Her claims are premised on the unique circumstances that she encountered in the immediate aftermath of her psychotic episode.

45

Brooker maintains that the Authority was *constitutionally* required to inform her of her statutory right to seek "reasonable accommodations" for her disability in its eviction notice and subsequent denial letter. ECF No. 1 at ¶ 72; ECF No. 45 at 24-27. She bases this assertion on the fact that Authority personnel subjectively knew that the incident precipitating her eviction had caused her to be hospitalized. ECF No. 45 at 25. The crux of her argument is that notification of her right to request the accommodations required by statute would have significantly reduced "the risk of an erroneous deprivation" of her tenancy and rental assistance. *Mathews*, 424 U.S. at 335.

In *Goldberg v. Kelly*, 397 U.S. 254, 260-266, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the Supreme Court held that the Due Process Clause required a State to provide a welfare recipient with a hearing before terminating his or her benefits. Speaking through Justice Brennan, the Supreme Court went on to state as follows:

> The opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard. It is not enough that a welfare recipient may present his position to the decision maker in writing or secondhand through his caseworker. Written submissions are an unrealistic option for most recipients, who lack the educational attainment necessary to write effectively and who cannot obtain professional assistance. Moreover, written submissions do not afford the flexibility of oral presentations; they do not permit the recipient to mold his argument to the issues the decision maker appears to regard as important. Particularly where credibility and veracity are at issue, as they must be in many termination proceedings, written submissions are a wholly unsatisfactory basis for decision. The secondhand presentation to the decisionmaker by the caseworker has its own deficiencies; since the caseworker usually gathers the facts upon which the charge of ineligibility rests, the presentation of the recipient's side of the controversy cannot safely be left to him. Therefore a recipient must be allowed to state his position orally. Informal procedures will suffice; in this context due process does not require a particular order of proof or mode of offering evidence.

*Goldberg*, 397 U.S. at 268-269 (footnote omitted). Because the benefits available under the Housing Act satisfy needs of a magnitude equal to those satisfied by welfare benefits, the

46

reasoning employed in *Goldberg* "applies with equal force" in the present context. *Basco v. Machin*, 514 F.3d 1177, 1182, n.7 (11th Cir. 2008).

Seizing on the language in *Goldberg* declaring that "[t]he opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard," Brooker insists that the Due Process Clause required the Authority to inform her of her right to seek the reasonable accommodations required under the FHAA, the Rehabilitation Act and the ADA. ECF No. 45 at 24-26. The language relied upon by Brooker, however, referred to the "capacities and circumstances" of an entire class of individuals (*i.e.*, welfare recipients). *Goldberg*, 397 U.S. at 268-269. It did not refer to the "capacities and circumstances" of a particular individual. *Id.* The Supreme Court was explaining that the acceptance of "written submissions" would be "an unrealistic option for *most recipients*," thereby necessitating the provision of oral hearings. *Id.* at 269 (emphasis added).

The procedures utilized to effect a deprivation of liberty or property, of course, must ensure that "the entitlement claims of *individuals*" are given fair consideration. *Mathews*, 424 U.S. at 349 (emphasis added). For this reason, the Due Process Clause sometimes requires a State to take extra steps to ensure that those "known to be incompetent" are provided with the requisite notice that their liberty or property is in jeopardy. *Covey v. Somers*, 351 U.S. 141, 146-147, 76 S.Ct. 724, 100 L.Ed. 1021 (1956). The Fourteenth Amendment requires a State to employ means tailored to provide interested parties with *actual notice* of the relevant legal proceedings. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-315, 70 S.Ct. 652, 94 L.Ed. 865 (1950). That requirement, however, was clearly satisfied in this case. Sills knew about the eviction notice shortly after it had been posted. ECF No. 47-8 at 5. Brooker was provided with notice of her eviction during the course of her hospitalization. ECF No. 47-1 at

47

99. Even if her status as a hospitalized patient had prevented Brooker from receiving prompt notice of her eviction, the two-week period available for the filing of a "grievance request" would have commenced on the date of her *receipt* of Price's letter. ECF No. 53-22 at 3.

The eviction notice informed Brooker of her right to request an "informal conference" in accordance with 24 C.F.R. § 966.55. ECF No. 53-22 at 3. A request submitted pursuant to that regulation must specify "[t]he reasons for [a person's] grievance" and "[t]he action or relief sought." 24 C.F.R. § 966.55(a)(1)-(2). Price's letter to Brooker made reference to these requirements. ECF No. 53-22 at 3. The letter further explained that Brooker's failure to request an informal conference would not constitute a waiver of her "right to contest the Authority's action at the appropriate judicial level." *Id.* For reasons that are not entirely clear, Brooker decided to leave the Eleventh Street Tower without challenging the Authority's decision. ECF No. 53-24 at 2.

Brooker's constitutional claims are not based on an assertion that the Authority failed to provide her with notice of her need to specify "[t]he reasons for [her] grievance" and "[t]he action or relief sought." 24 C.F.R. § 966.55(a)(1)-(2). Instead, they are premised on a contention that the Authority had a constitutional responsibility to inform Brooker of her right to request the "reasonable accommodations" required by statute and identify this as a particular form of relief available to Brooker. ECF No. 1 at ¶ 72. In view of Brooker's argument, the language in *Goldberg* referenced in her brief does not come from the portion of that decision most pertinent to her case. ECF No. 45 at 24. In a later portion of its opinion, the Supreme Court made the following observations:

> "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932). We do not say that counsel must be provided at the pre-termination hearing, but only that the recipient must be allowed to retain an attorney if he so

48

desires. Counsel can help delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination, and generally safeguard the interests of the recipient.

*Id.* at 270-271. The application of this standard to the instant case confirms the constitutional validity of the Authority's actions in relation to Brooker. If Brooker had requested the hearing described in Price's letter, she would have been permitted to retain an attorney or a lay representative to "make statements on [her] behalf." 24 C.F.R. § 966.56(b)(2). As the Supreme Court recognized in *Goldberg*, it is the responsibility of an attorney to "delineate the issues" relevant to a particular case. *Goldberg*, 397 U.S. at 270. In Brooker's case, the statutory "reasonable accommodation" requirements were among the "issues" relevant to whether the eviction was lawful. 42 U.S.C. §§ 3604(f)(3)(B), 12131(2). The Due Process Clause required only that Brooker be *permitted*, at her own expense, to hire an attorney with the competence to raise those issues. *Goldberg*, 397 U.S. at 270.

It is not entirely clear when Brooker secured the services of an attorney. ECF No. 47-8 at 5. In any event, the Constitution did not require the Authority to act as counsel for Brooker. *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 246 (3d Cir. 2013). The Authority cannot reasonably be expected to provide its tenants and beneficiaries with case-specific advice as to how they should challenge particular administrative decisions. *Hedges v. United States*, 404 F.3d 744, 752-753 (3d Cir. 2005). Advice of that nature could conceivably cause unrepresented parties to rely on theories that, at the end of the day, could prove to be detrimental to their interests. *Pliler v. Ford*, 542 U.S. 225, 231-232, 124 S.Ct. 2441, 159 L.Ed.2d 338 (2004). The Authority satisfied its constitutional obligations by informing Brooker that *she* needed to "specify the reason(s) for [her] grievance and the action or relief sought" if she wanted to challenge the eviction decision. ECF No. 53-22 at 3. It was not required to do that for her.

49

Regardless of what was required by statute or regulation, the Authority was not *constitutionally* required to give advice to Brooker that, under normal circumstances, would come from her attorney. *Martinez v. Court of Appeal*, 528 U.S. 152, 162, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000); *McKaskle v. Wiggins*, 465 U.S. 168, 183-184, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984).

To the extent that Brooker challenges the adequacy of the notice accompanying Walter's letter dismissing the application for Section 8 rental assistance, her Fourteenth Amendment claims must fail for similar reasons. The Authority's prerogative to withdraw Brooker's application because of her prior "eviction" was subject to the "reasonable accommodation" requirements existing under federal law. 24 C.F.R. § 982.552(c)(2)(iv). It was the responsibility of Brooker's attorney to decide whether, under the particular circumstances, those requirements were to be relied upon in opposition to the Authority's decision. *Goldberg*, 397 U.S. at 270-271. Walter's letter clearly identified the "eviction" as the Authority's reason for withdrawing the application. ECF No. 53-25 at 2. Brooker responded by submitting a handwritten statement discussing the causes of her psychotic episode and describing her subsequent recovery. ECF No. 53-26 at 2-3. The letter adequately placed Brooker on notice of the relevant factual issues, thereby providing her with a meaningful opportunity to present her case. *Ritter v. Cecil County Office of Housing & Community Development*, 33 F.3d 323, 330 (4th Cir. 1994). The Defendants' motion for summary judgment will be granted with respect to Brooker's constitutional claims. ECF No. 1 at ¶ 72.

The Court has already dismissed the FHAA, Rehabilitation Act and ADA claims asserted against Johns and Walter in their personal capacities. *Brooker*, 2012 WL 913242, at *3-4, 2012 U.S. Dist. LEXIS 35691, at *9-12. In her complaint, Brooker does not specify whether she has sued Johns and Walter in their personal or official capacities. ECF No. 1 at ¶¶ 9-10.

50

Nonetheless, it is clear that both individuals serve as officers of the Authority. *Id.* Claims brought against Johns and Walter in their official capacities are indistinguishable from claims brought against the Authority itself. *Brandon v. Holt*, 469 U.S. 464, 471-472, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). Given that Brooker can proceed with her statutory discrimination claims directly against the Authority, there is no need for her to bring parallel discrimination claims against Johns and Walter in their official capacities. *Kentucky v. Graham*, 473 U.S. 159, 167, n.14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Additionally, because the claims arising under the Housing Act and the Fourteenth Amendment will be dismissed, there is no reason for Johns and Walter to remain as named defendants in this action. *Malone v. Economy Borough Municipal Authority*, 669 F.Supp.2d 582, 604-605 (W.D.Pa. 2009). They will be dismissed as parties to this case, and the caption will be amended accordingly.

### D.    Punitive Damages

A municipality qualifies as a "person" amenable to suit under § 1983. *Monell v. Dept. of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Supreme Court has declared that "§ 1983 is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Imbler v. Pachtman*, 424 U.S. 409, 418, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Because municipal entities were immune from awards of punitive damages at common law, the Supreme Court held in *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), that punitive damages were not available in actions brought against municipalities under § 1983. In *Doe v. County of Centre*, 242 F.3d 437, 457-458 (3d Cir. 2001), the United States Court of Appeals for the Third Circuit held that governmental entities were also immune from awards of punitive damages in actions brought under § 504 of the Rehabilitation Act and Title II of the ADA. Although punitive damages are

generally available in actions arising under the FHAA, the relevant statutory provision contains no language suggesting that Congress intended to disturb the "settled common-law immunity" from such damages enjoyed by governmental entities. 42 U.S.C. § 3613(c)(1); *Doe*, 242 F.3d at 456. Consequently, plaintiffs proceeding under the FHAA cannot recover punitive damages from municipalities. *Inland Mediation Board v. City of Pomona*, 158 F.Supp.2d 1120, 1158-1159 (C.D.Cal. 2001).

Brooker's prayer for relief includes a request for punitive damages. ECF No. 1 at 15, ¶ d. Relying on *Fact Concerts*, the Defendants argue that punitive damages cannot be assessed against the Authority in this case.[19]  ECF No. 75 at 5-7. Attempting to refute the Defendants' argument, Brooker calls the Court's attention to 35 PA. STAT. § 1544(a), which provides:

> **§ 1544. Formation of Housing Authorities**
> (a) There are hereby created separate and distinct bodies, corporate and politic, one for each city (as herein defined), and one for each of the counties of the Commonwealth. Each such Authority may be known as the housing authority of the city or the county, as the case may be, but shall in no way be deemed to be an instrumentality of such city or county, or engaged in the performance of a municipal function. Each such Authority shall transact no business or otherwise become operative until and unless a finding is made, as hereinafter provided in this section.

35 PA. STAT. § 1544(a). The "finding" described in the statute refers to a determination that a need exists for a housing authority to "function within the territorial limits of [a particular] city or county." 35 PA. STAT. § 1544(b). Brooker maintains that since the Authority is not classified as a "municipality" under Pennsylvania law, it has no immunity from the punitive damages that she seeks in this action. ECF No. 45 at 27-28.

The argument advanced by Brooker is unavailing. The common-law immunity from punitive damages underpinning the Supreme Court's decision in *Fact Concerts* extended to "all

---

[19] The Authority is clearly a "person" subject to suit under § 1983. *Solomon v. Philadelphia Housing Authority*, 143 Fed.Appx. 447, 456, n.14 (3d Cir. 2005) (unpublished). Since Brooker's § 1983 claims must be dismissed in any event, that issue is inconsequential.

governmental units." *Bolden v. Southeastern Pennsylvania Transportation Authority*, 953 F.2d 807, 830 (3d Cir. 1991). Although Pennsylvania's Housing Authorities Law does not characterize a housing authority as a municipal entity, it specifically provides that such an authority exercises the "public powers of the Commonwealth as an agency thereof." 35 PA. STAT. § 1550. The immunity from punitive damages enjoyed by governmental entities reaches far enough to cover the Authority. See *Doe*, 242 F.3d at 455-456.

The decision in *Fact Concerts* was influenced by a concern that the assessment of punitive damages against a municipality "would burden the very taxpayers and citizens for whose benefit the wrongdoer was being chastised." *Fact Concerts*, 453 U.S. at 263 (discussing the reasons why municipal entities were immune from awards of punitive damages at common law). Brooker contends that any monetary judgment entered against the Authority in this case would be satisfied from "investment returns and tenant rents" rather than from "tax revenues." ECF No. 75 at 6. Although Johns acknowledged in her affidavit that the Authority had "certain reserve funds," she declared that they were "needed to maintain housing benefits due to lost subsidies from the Department." ECF No. 53-5 at 3, ¶ 22. She also stated that any judgment entered against the Authority would reduce funding that would otherwise be used to provide benefits and services to Altoona residents. *Id.* at 3-4, ¶ 23. The fact that the cost of a judgment would be borne by the public in a more general sense is sufficient to establish the Authority's entitlement to immunity from punitive damages. The United States Court of Appeals for the Third Circuit has extended such immunity to governmental entities that do not receive tax revenues. *Evans v. Port Authority of New York & New Jersey*, 273 F.3d 346, 356-358 (3d Cir. 2001). The Defendants' motion for summary judgment will be granted to the extent that it seeks

the dismissal of Brooker's request for punitive damages. *Stewart v. Philadelphia Housing Authority*, 487 F.Supp.2d 584, 592 (E.D.Pa. 2007).

## VI. CONCLUSION

Brooker's motion for summary judgment (*ECF No. 44*) will be denied. The Defendants' motion for summary judgment (*ECF No. 50*) will be granted with respect to the claims arising under the Housing Act and the Fourteenth Amendment and denied with respect to the claims arising under the FHAA, the Rehabilitation Act and the ADA. Johns and Walter will be dismissed as defendants in this action, and the caption of the case will be amended to reflect the Authority's status as the only remaining defendant. Brooker's request for punitive damages will also be dismissed.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOSEPHINE BROOKER, )
)
     Plaintiff, )
) CIVIL ACTION NO. 3:11-CV-95
     v. ) JUDGE KIM R. GIBSON
)
ALTOONA HOUSING AUTHORITY, )
CHERYL JOHNS, *its Executive Director*, )
LINDA WALTER, *Section 8 Coordinator*, )
and JOHN or JANE DOE, )
)
     Defendants. )

## ORDER

**AND NOW**, this 12th day of June_____, 2013, IT IS HEREBY ORDERED

that: (1) the Plaintiff's Motion for Summary Judgment (*ECF No. 44*) is **DENIED**; (2) the

Defendants' Motion for Summary Judgment (*ECF No. 50*) is **GRANTED** with respect to the

claims arising under the Housing Act and the Fourteenth Amendment (*ECF No. 1 at ¶¶ 71-72*)

and **DENIED** with respect to the claims arising under the FHAA, the Rehabilitation Act and the

ADA (*ECF No. 1 at ¶¶ 73-75*); (3) the Plaintiff's request for punitive damages is **DISMISSED**;

(4) Defendants Cheryl Johns and Linda Walter are **DISMISSED** as parties to this action; and (5)

the caption is **AMENDED** to reflect the fact that only the Altoona Housing Authority remains as

a defendant in this case.

                                  **BY THE COURT:**

                                  **KIM R. GIBSON**
                                  **UNITED STATES DISTRICT JUDGE**

cc:    All counsel of record